Last case of this morning, No. 17-2886, G.S. et al. v. Rose Tree Media School District. Ms. Meehan and Mr. Raffaele? Yes, sir. Raffaele. Raffaele. Okay. Thank you. Please support. My name is Catherine Meehan. I am representing the appellant in this matter, the Rose Tree Media School District. I would like to reserve two minutes of my time for rebuttal. You sure can. The established facts in this matter that are not in dispute show that the appellees have established a fixed, adequate, and permanent home under the definition contained in the McKinney-Vento Act. Maybe you could start by answering this. Does G.S. live in the same home as his sister? He does. And does the school district view the sister as homeless? No. Does the school district provide her the benefit as if she were homeless? Well, Your Honor, let me clarify my answer there. What happened in this matter, and yes, S.S. and G.S. are siblings. They do live in the same household. The school district has maintained S.S. as a student of the school district, even living in another school district because Which you can only do if it's considering her homelessness to continue, right? The reason why S.S. has been allowed to continue is solely because of the litigation in this matter. And the district in that, looking at that child, decided this child is not involved in the litigation as it was standing at the time. We're not going to disrupt that child's education. We're going to allow that child to continue in the school district. And the reason they allowed her in was because she was homeless, right? And they haven't disrupted that decision. Well, she... This is a factual matter. She was let in because she was determined to be homeless, right? Well, and just for clarity's sake, G.S. and S.S. were members of the, were students of the Rose Tree Media School District prior to moving out of the district. S.S. was allowed to continue, and so was G.S. because initially they were homeless. Yeah, I think you can take it as a given that we know the facts. My only question to you is, you've got siblings living in the same house. One is being permitted to stay in the Rose Tree School District. Presumably under the McKinney-Pinto Act. And she's being in that district because she was determined to be homeless. That's all factually given, right? Well, in response to Judge Ambrose's comment, it's solely because of this litigation that she's being allowed to stay. The district does continue to consider the entire family to have established permanent residency in the Chester Upland School District, not in the Rose Tree Media School District. So it is the case that they're letting somebody in that shouldn't be in. So what you're saying is, yeah, S.S. is there, but she shouldn't be there. Correct. Okay. And your school district is free to do that? It's free to take people in who have no right or opportunity? Well, I mean, Your Honor, it is contrary to the policies of the school district, but again, solely because there's litigation in this matter. And not to disrupt that child's education, they've allowed the child to continue attending the Rose Tree Media Schools. Did the person who's responsible for determining homelessness on behalf of the school district tell G.S. or his parents that he would have been considered homeless but for the settlement agreement? I don't know if that particular conversation took place, but it was clearly contemplated between the parties when the settlement agreement was being negotiated, that the residency of the family, of the appellees, was clearly in discussion and in dispute. And that's why the... I thought as a factual matter that didn't happen, that there was a conversation and he was, or the parents were told, yeah, he'd be considered homeless because he's doubled up, but the reason we can't let him back in is because of the settlement agreement. Is that factually inaccurate? I believe that's factually inaccurate, Your Honor, because when the agreement was signed in August of 2015, at that point in time, and that's why that language is in the settlement agreement, acknowledges that there's no continuing obligation of the school district beyond the 15-16 school year to educate G.S. And again, they won't claim homelessness after the 15-16 school year was inserted in that agreement. If they still considered him to be homeless at that point in time, that language would never have been included. But the language in there covers only outstanding claims through August 31, 2016, right? A year later. No, Your Honor. What we've always held, the appellant has always held that the consideration for the promises and the forbearances that were offered up for that settlement agreement were validly supported by consideration. The piece that we're looking at and the part about not... was always in there. It was contemplated. It was there when the agreement was signed. It was a fully counseled settlement agreement negotiated between the parties. There was back and forth with various drafts of the settlement agreement. And every prior, you know, I'll represent to you as an officer of the court, that every prior settlement agreement draft contains the language that said that just because the school district is providing the private school tuition for one year does not create an obligation for the school district to educate GS beyond the 15-16 school year. Let me quote to you from the appendix, page 365. This is a letter from Shane Burroughs, Regional Site Coordinator, McKinney-Vento Homeless Act Region 8 person. Now, this is part, I guess, of the Bucks County Schools. Yeah, he's the regional coordinator that covers our region. So is that the person to whom the Rose Tree School District would look for determinations about homelessness? I believe it is. Okay. So this is a letter from September 1, 2016 to the parents of GS and SS. Quote, this is to inform you that we received your dispute letter on August 25, 2016, and the outcome of our investigation is that GS, as well as SS, and I'm using the initials there, have the right under the Federal McKinney-Vento Homelessness Act to continue being educated by the Rose Tree Media School District since it is their school district of origin and they are temporarily residing in a doubled-up living situation  So, now that I've quoted that to you, is it or is it not the case that the person responsible for making these kind of decisions said, you're homeless under the Act? Well, Your Honor, we believe that that letter was based on incorrect information that was provided to him. The maternal grandmother of GS with whom they were residing testified in her deposition that she signed a letter, she didn't know who wrote it, she didn't know what it said, but we believe the letter said, we have never been able to see the letter, but we believe the letter said from maternal grandmother, I don't have the financial resources to maintain this family. The family will have to move out by June of 2017. That letter was written in the fall of 2016. So at that point, it appeared to Mr. Burroughs that it was a temporary situation. Mr. Burroughs doesn't say anything about a temporary situation. Maybe I'm wrong about that, but I thought, well, let me ask it to you this way. Let's set this aside. There's a determination when they first go into the school district that because they've doubled up with grandma, they are homeless under the McKinney-Vento Act, right? Correct. And they're allowed in. And again, I would just say that they were already students of the Rose Tree Media School District, so at that point in time, it was their district of origin, so when they moved to the outside school district, they had chosen school district of origin because the school district itself said to them, under the circumstances we're seeing, and this is in the fall, this is in November of 2014, under the circumstances we're seeing, you probably qualify as homeless under the Act. Okay. So they're homeless under the Act at that point. The only thing that's changed in the interim is the passage of time and the dispute and settlement. Those are the only things, right? Those aren't the only things. I mean, I would suggest to Your Honor, and I'm What else are you relying on? The fact that they have remained, relying on the words of the statute that says to be fixed, adequate, and regular. Don't, don't, I'm sorry, I'm trying to get you to focus on facts, not on the statute. What else besides the fact of the passage of time and the dispute and settlement, what else are you relying on, if anything, to say, no, not homeless anymore? The major fact is that there is no uncertainty in their living arrangement. Maternal grandmother testified in her deposition under oath that the family is allowed to stay as long as they want. They're not causing her any financial So it's a passage of time issue? Well, no. I mean, she's saying they're not causing, I'm not, I would never throw them out on the street. There's no instability in their living arrangements. And you think that's a change? So you thought that maybe before, when they first moved in with grandma, she was going to throw them on the street? It's possible. It's possible. They had moved in and out of the same residence on other occasions. They've lived there, and not near, near to the time that we're talking about here, but in past occasions, they had lived there at that same house. But definitely, when grandmother says, I'm never going to throw them out on the street, at that point in time, they're established, they're rooted. So what constitutes adequate housing? That's an excellent question, Your Honor, because the statute doesn't define it. But what I would say is adequate means, you know, you have a roof over your head, you have a place to sleep at night, you have regular living arrangements, everything that exists in this case. So a shack somewhere would be a roof over your head, and you'd be sheltered, and that would be adequate housing, even though it's 80 square feet and you've got eight people living there. Well, I think, you know, why the Act uses three words, fixed, adequate, and regular, to describe the circumstances where homelessness might apply, if there's a lack of those circumstances. In this situation, we have it's fixed, adequate, and regular because they have a roof over their heads, they're with close family members, they're never going to lose their housing, they're here for the duration, there's no threat of eviction. Both JS and ES, the parents, have registered to vote from this address. They have had their driver's licenses, the address on their driver's licenses at this address. So it differs from a shack, which I would think of a shack like a hotel or a park or a tent outside, which is homelessness, that's clearly homelessness, because it's not an adequate situation. There may be a roof over your head, but that's it. But the Act specifically contemplated this doubling up scenario as constituting homelessness. However, I would say that you have to read the two parts of the definition together, where you have the fixed, adequate, and regular, and it can include doubling up, and it can include any of those other circumstances that are mentioned in the statute. In our case here, you know, we are arguing that they have fixed, adequate, and regular, but that doesn't change. Yeah, that's the, this is the language from the statute that I believe Judge Van Aske is referring. It says, the term homeless children and youth includes children and youth who are sharing the housing of other persons due to loss of housing, economic hardship, or a similar reason. Now that fit GS and SS when you said, yeah, you're homeless, you can stay in a roastery, right? Why do you need anything more? Initially it did, but they continued to stay. Because once, because the passage of time and grandma saying, yeah, I'm not throwing my kids out, that suddenly converted children who were sharing housing of other persons due to loss of housing, economic hardship, or similar reason, that changed that into permanent housing, in your view. Well, and the other key point here, along with what you've mentioned, is that ES and JS parents are not looking anywhere else to reside. They're not looking to move out. They did testify that in 2014, when the district concedes that they were homeless, that they had looked at that point in time since that time. And passage of time is important, Your Honor. So what's the passage of time? It's important, but it's not the sole factor. And doubling up is not the sole factor. We're saying the court needs to look at all the circumstances, which I believe our amicus colleagues would agree with that, that temporary means it's not fixed. If you look at the amicus brief, the homeless cases that they cite are far different from this, because it's not an intact family residing. I'm pretty confident the amicus would not agree with you, but be that as it may, I think I got your position. Okay. We'll hear from Mr. Raphael and get you back on rebuttal. I'm sorry? We'll hear from Mr. Raphael and get you back on rebuttal. Thank you very much, Your Honor. Thank you. Good morning. You may please the court. I'm Michael Raphael. I represent Apolese in this matter. I would like to note for the court that Apolese ES and GS are present here today for the hearing. One of the questions I have is in connection with the agreement that was entered into. It does go up to August 31, 2016, but it also says in there that there will be no claim of homelessness with respect to GS for the school year post-August 31, 2016. Yes, Your Honor, it does. The proxy waiver, as we call it in our briefs, says that there will be no assertion of homelessness by the family from August 31, 2016 into perpetuity. And it is our argument, of course, Your Honor, that the proxy waiver is invalid for a number of reasons. It is a proxy waiver of the rights of a child by a parent by near dint of the parental relationship, which under Pennsylvania law is insufficient for a justification for waiver of the child's rights. Second, that it is a prospective waiver in violation of a strong public policy as set forth by Congress in the Purposes Section of the McKinney-Vento Act, Section 11-431, Your Honor. And the basis on which the district court relied, Your Honor, that there was no consideration recited in the contract for that waiver. As Your Honor knows, the contract in Paragraph 4 specifically states that consideration in the contract is sufficient only for waivers from the beginning of time through to August 31, 2016, not following that point. Even if all that's true, don't you have to deal with whether or not your clients are homeless under the Act? Yes, Your Honor, we do have to deal with that. All right. So do you agree or disagree with Ms. Meehan's assertion that whether somebody is homeless or not depends on whether they have a fixed permanent place of residence? Yes, Your Honor. The question of whether a person is homeless turns on whether they fit within the definition of homelessness in the McKinney-Vento Act. Okay. And their assertion is if a grandmother living, just hypothetically here, grandma living in a nice five-bedroom home all by herself invites her offspring, her son or daughter and spouse and two kids, just use a hypothetical, into the home so there's a nice bedroom for everybody, everybody's comfortable, and they stay there. They move in and that's where they register to vote, that's where they register their vehicles, that's where they've lived for the last five, six, seven, ten years. Is it your position that that's doubling up and they are always homeless because at the start, within the first month, they thought, well, we'll just stay with grandma temporarily? Is it the assertion that if they think this is temporary to start with, that it's forever after you're homeless? No, Your Honor, that's not my position. Okay. So the school district seems to be making the argument, they are making the argument, that well, maybe something that was temporary to start with ceases to be temporary and it becomes fixed and stable and they're perfectly comfortable and they're doing all the things I mentioned, registering to vote, etc., etc. They have a home. It happens to be a home that is owned by grandma, but it's their home. What's wrong with that argument? Your Honor, it has a number of flaws with respect to the district. First, it ignores the definition in the McKinney-Vento Act that persons are homeless if they are doubled up with another by reason of financial instability, loss of housing, or other similar reasons. Well, hold on then, because I thought you had agreed a moment ago that what started out perhaps as a doubling up because of financial hardship might cease to be that. Are you backtracking on that? No, Your Honor, I don't think I understood that that was by reason of financial hardship. My understanding was that it was a family being invited to stay without that preparation. So they move in because they have to. They've got a problem and they can't make rent. They move into grandma's house. They're ever after homeless, even though everybody is perfectly comfortable, nobody has an intent to leave, they're living there because they want to live there, but because they moved out of their apartment under some financial duress or stress forever after they're homeless. That's your reading of the Act. Not necessarily, Your Honor. I believe that there's a mechanism set up in the Act to make determinations and set up under Pennsylvania law to make determinations about whether somebody is homeless or whether somebody has become a resident of another district. And in this case, the district had those mechanisms available to it in the forms of its residency inspectors. And under the McKinney-Vento Act, by going to Shane Burroughs. The district did not engage in the process with Mr. Burroughs, even though it was permitted to do so and, in fact, required to do so by the Pennsylvania local agency law and by the McKinney-Vento Act. They simply ignored the investigation. Their argument, if you heard Ms. Meehan say it here, is Mr. Burroughs was given false information, false information that implied there was something temporary about this housing when it wasn't. I heard Ms. Meehan's assertion on that, Your Honor. I, again, respectfully disagree with the district on that position. Moreover, as the district says in its papers, the district declined to speak with Mr. Burroughs, even though there was no reason for it to decline to speak with Mr. Burroughs when called. And to Your Honor's recollection, the only response the district gave to the parents and to Mr. Burroughs, I'm sorry, to the parents, was that GS was not permitted to attend because of the proxy waiver, not because of anything having to do with the McKinney-Vento Act. To get back to your question, though, Your Honor, my answer is that that may, in fact, be a case where somebody has ceased to be homeless because they have achieved a fixed, adequate, and regular residence where they're doubled up in the home of another, but in that case it is not by reason of financial instability. Moreover, Your Honor, I think there would have to be, in that case, a legal right to remain. Your Honor, of individuals in the United States who are homeless, 76%, I believe, are homeless and doubled up. It is the primary form of homelessness. In Pennsylvania, we believe it's undercounted, but it's 62%. You lost me there because when you say you could be doubled up, but be in a circumstance along the lines of Judge Jordan's hypothetical where the sharing arrangement is fixed, regular, and adequate, and you said, but there's a legal right to remain, you lost me there. Well, Your Honor, there are two things. One is the stability of the housing, because one of the things that the McKinney-Vento Act is meant to avoid. Judge Jordan's question is, what happens if it's quite stable? If it is quite stable, Your Honor, then you go through the process of McKinney-Vento grievance to determine whether the person is homeless by reason of being doubled up due to financial instability, loss of housing, or for similar reasons. And you're saying the school district never went through this process? Yes, Your Honor, that's correct. The school district never did go through that process. They just mentioned in the assertion that they're no longer homeless, and therefore we don't have to provide the housing. That was their position throughout, Your Honor. They had the opportunity to say that to Mr. Burroughs and declined to do so. Your Honor, they could request a determination of this back for the 2018-2019 school year? Yes, Your Honor, they could. They could, and during that dispute, during the pendency of that dispute, the S children would need to be enrolled. They'd still be enrolled. Sure. But there is a mechanism for that, and the district did not avail itself of any such mechanism. Is GS successfully completing now his junior year of high school? Your Honor, he's on his way to completing his junior year of high school. Yes. By that you mean? Your Honor, he hasn't graduated. He hasn't completed out his school work for the year yet, Your Honor. When is the school year over? June 18th, I believe, Your Honor. Okay. And he's scheduled to complete his junior year on June 18th? I believe so, Your Honor. Okay. Is it the case that following the letter I quoted, there was no further determination about homelessness, except for the assertion made by the school district? Well, Your Honor, there was, in November of 2016, a visit to the home by the home and school visitor for the district, Bernadette Dacanet, who testified in this case, Your Honor, that her observations of the home were identical to what she heard of the home in November of 2014, at the time that the district made its determination that the S family is homeless and that there had been no intervening change of circumstances, that the family still lived doubled up in a single family home with ten people, where they had no private space, no beds, and that their living area, which is in the living room, is an area through which everybody else must pass to access other parts of the home. And, Your Honor, I think it's worth noting that that gets to the primary forms of instability that come with being doubled up in the home of another. The S family is in a circumstance where GS and SS, who, as Your Honor correctly noted, has continued to be enrolled by the district under the McKinney-Vento Act without interruption from the beginning of this entire case. They're facing exactly the kinds of instability that come with being homeless and doubled up. They have no private space. They have no place to study. There is a great deal of tension in the home, as the parents both testified. They face the very kinds of stress and uncertainty that the McKinney-Vento Act is meant to address for children in particular because constancy in education, stability in education, is the best bulwark against having that kind of poverty and difficulty echo down through the generations. This is the core purpose of the McKinney-Vento Act, Your Honor. Now, if there had been consideration given, assume for the sake of discussion that that legal point were decided against your client instead of having been decided in favor of your client. None of that would matter, right? Because GS was, in effect, paid to not assert that McKinney-Vento claim, correct? No, Your Honor. I respectfully disagree. I think there are a couple of other boxes that would have had to be ticked off. In particular, as Pennsylvania courts have said, when there is a prospective waiver of a child's rights or a prospective waiver of liability that goes against a strong public policy. So it could never have happened. As a matter of public policy, your position is, unless the McKinney-Vento Act is said in hot verba, and parents can settle grievances under this with the school district, no matter what the parent said, it couldn't have been settled with the school district. No, Your Honor. I think that there are situations where it's conceivable that McKinney-Vento rights could be waived in this way, but there would need to be appropriate protections of the right of the child. For example, under Pennsylvania Rule of Civil Procedure 2039, a minor's compromise, for the court to look at whether the parents were waiving the rights of the child that belong exclusively to the child in a way that is adequately compensated, in a way that is adequately protected, and in the same way that the Eastern District of Pennsylvania protects under the law. Well, let me end with this, because certainly from the school district's perspective, they think we did what we needed to do. We took the guardian, the parents. We worked out a solution. We paid a sum of money to work this out. And this was to deal with a problem that, from their perspective at least, GS caused. GS caused the problem in the school, and this was a way of resolving that disruptive problem. And they did what they thought they had to to resolve that problem, which included an exchange of value. My question to you is, leaving aside the problem with the drafting of the instrument, which you've relied heavily on, the inclusion of the end date, if that inclusion of the end date hadn't occurred, your position is they still should lose. And I'm trying to find out what, if anything, could they have done as the school district to satisfy themselves and you that it was lawful for them to make a compromise with GS and his parents. That's right. Which is beyond all possibility. No, no, no, it's not beyond all possibility. There conceivably can be waivers of McKinney-Vento rights in the way that the district contemplated here, but not on the facts here, and in particular, Your Honor, because there was no effort to engage in available processes to protect the rights of the minor child that are separate from the rights of the parent. The district and the parties in this case could have gone to a court of common pleas judge in Pennsylvania and submitted to the court of common pleas a request for a minor's compromise for a declaratory judgment, which is, in fact, precisely the mechanism that the district started to pursue after it had already heard from Mr. Burroughs that it was required to enroll GS and SS. They could have done that years ago and did not. So I'm not saying, Your Honor, that this can't happen. I'm saying that it cannot happen lawfully on these facts. Okay. Your Honor, I also wanted to address the district's claim that SS has been continuously enrolled out of the goodness of the district's heart or for no reason because of the tendency of this litigation. I would note that this litigation concerns specifically her rights as a child in the McKinney-Vento Act,  and the district acknowledged that continuing to enroll SS as a student not under the McKinney-Vento Act would be a violation of its policy. I also wanted to note, for Your Honors, that the district, as a local education agency, receives funding that comes from the federal government for the education of homeless children and youth, and if the district is claiming SS under the McKinney-Vento Act but not enrolling her under the McKinney-Vento Act and receiving funds as a result, that would be not just a violation of district policy but a fraud. And I doubt, Your Honors, that the district is enrolling her for no reason but rather that it has enrolled her under the McKinney-Vento Act. And is receiving federal funds as a consequence of that? Yes, Your Honor. But that's not in the record, is it? No, Your Honor, it's not. But what is in the record, Your Honor, is that at pages 291 through 293 of the appendix, in this case, Your Honor, the McKinney-Vento coordinator for the district, Dr. DeMoreno-Lennon, says that the only reason that GS is not enrolled and that SS is is because of the proxy waiver. And so it's not having to do with status under the McKinney-Vento Act but rather the waiver record. That is in the record. Yes, Your Honor, that is. I see that my time has expired. Thank you. Thank you very much. Thank you, Your Honor. Ms. Meehan. Thank you, Your Honor. Thank you, Your Honor. In response to Your Honor's questions about only the passage of time, what it comes down to in the factual scenario here presented is that this has been a matter of choice for our appellees. Is there a process the school district could follow to have a determination made that their status changed from being homeless to now not being homeless? Your Honor, I believe under the McKinney-Vento Act that responsibility falls to the school district to make that determination, which they did in this case. There wasn't a formal proceeding, but looking back at the circumstances. Where is Mr. Burroughs standing on all of this? Your Honor, he was contacted unilaterally by the FLEs in this case and was provided information that was not provided to the school district. And the reason why Dr. DeMarino-Lennon didn't speak directly with Mr. Burroughs in depth about the, I believe she spoke with him on the phone but not in depth about the terms of the settlement agreement, is because there was a confidentiality provision within the settlement agreement. And we're back to our original issue, which is we have a valid settlement agreement to hold the appellees to. Okay. That's important. So you're saying that the school district declined to participate in the process by which the determination was made because they decided, the school district decided, for reasons good and sufficient to itself, that the settlement agreement was going to control here? Correct. Correct. I mean, they made a determination. And based on the visit by Ms. Dackeney, that the family was remaining in the same situation. There was a passage of time, but we found out in discovery that GS had also established a bedroom. Is Mr. Raphael correct that her assertion from that visit was nothing had changed in the home? Well, she was only allowed to see the one floor. I'm just asking that. I mean, not asking for how much she was able to see. He made a factual assertion, which is she came out and said, nothing has changed in the family's living arrangement. Is that an accurate or an inaccurate statement of her report to the school district? My understanding of her report was that she saw what she saw at the time because that was what she was allowed to see, but we found out in discovery that things had changed, that GS established the living arrangements, established a desk, a bed, places to have privacy. I'm just trying to find out whether he's telling it accurately or not. He said she went into the home, she saw what she was allowed to see, came out and said nothing has changed. Is that accurate or not? I mean, I think that that is accurate. I think my understanding is that's what she testified to because that's what she was allowed to see. But I wanted to also come back to the important point of doubling up because that's been discussed with your honors. It's very, very common for all school districts in this state to have what we call multiple occupancy, and multiple occupancy is similar to doubling up in that the kids are residing with their parents, with another person who is a resident of the school district, and that's how under the Pennsylvania school code they are able to legally establish residency, and they do that by showing an address. It could be mail. It could be driver's licenses. It could be voter registration. That is perfectly legitimate and legal, and we would say that this family is living doubled up. I mean, doubled up multiple occupancy, it's the same thing, but in the Chester Upland School District. In the McKinney-Vento Act, I believe the intention is, as the amicus talked about, is it's like couch surfing. When they're talking about doubling up in the act, we're talking about moving place to place on a temporary basis, and if you look at the facts of this case, that's simply not where the appellee is at. Where do you get that interpretation of the act? Because if you look at the language of the definitions. Because the district court judge looked at it and said there's nothing in the act that says the temporal, that the passage of time converts one from homeless to actually in a home. But you can read the definition section, section 11434A of the McKinney-Vento Act, and if you read it as a whole and not in bits and pieces, and with respect to the court below, I think the court below looked at only that one circumstance as living doubled up, and I think that's a mistake here because the context of the definition is that you have, it cites numerous living situations that are temporary, tents, parks, hotel rooms, and it includes doubling up in that definition there by extension making it a temporary situation, which again is not what we have in this case. We have a family that's stayed together, gone from one place to another, stayed there stably. There has been, the only disruption to GS's education was because of GS's misbehavior in school. The amicus brief talks about this doubling up can be a precursor to living on the streets. Again, in this case it's not the case. The appellees have been told by their grandmother that they are in no danger of ever having to leave that residence. She could change her mind tomorrow, couldn't she? She hasn't, though. She could change her mind tomorrow, couldn't she? It's possible. It's very possible. If that's very possible, then doesn't that make their living situation tenuous? Well, again, you have to look back at the definitions under the act. And as a school district, they're trying to figure out. Your school district, your client has decided that grandma has kept them and therefore will always keep them. And even though your own school district employee came back and said, there's not a thing that's changed in their circumstances. Your whole case rests on grandma will keep them. The McKinney-Vento Act is instructive in Section 11302 where it describes, again, individuals or families. This is the definition. And it includes an individual or family who will imminently lose their housing. And that is based on either a court order. You know that can't be right, because we went through the definition before. And it includes people who move into and double up because of some economic hardship. Well, that definition is specifically applying to children and youth. Now, I'm looking at the general definition. And that's who we're talking about. And I think if you read the act together, it shows the intention of the act, which is that housing is temporary, that there's an imminent threat. And it goes on to talk about credible evidence that the owner, which would be grandma, is going to ask them to leave within 14 days. So there's a two-week period of time. So, again, I'm saying you read the act all together, and it makes it clear in my mind that it's intended to be temporary in nature, because the entire act is trying to keep students educated who are living in these situations where they're having to move from place to place. Another case that was cited, the MOK case out of New Jersey, talks about a family that was foreclosed in their house, moves in with their grandmother. Grandmother's house is then destroyed by Hurricane Sandy, so they move to an aunt's house for a few weeks in Paramus. And then from that house, they move to live with other relatives in New York. So they move several times within a very short period of time. It's like a two-year period. Even so, in that case, and it's under New Jersey law, so it's not binding to your honors, but even so, in that case, the court held the district in which they were residing responsible for the cost of the education, but allowed them to attend school in their school of origin from the beginning. So I'll just conclude to say that this is not a temporary living situation. This is not a doubling up situation as described by the act. This is a multiple occupancy situation that many school districts have, and that is a permanent situation. What's the difference between multiple occupancy and doubling up? Because previously you said doubling up and multiple occupancy at one point in the same sentence. Yes, because, and I think that's where confusion comes in. Under the definition section of the McKinney-Vento Act, doubling up when it's read with the rest of the paragraph indicates a temporary situation like couch surfing, whereas multiple occupancy is a place where the child lives with parents and they've shown an intent to live there by receiving mail, being able to establish themselves as residents of the school district. When does doubling up become multiple occupancy? When they continue to reside there for an extended period of time, they establish it as their residence, they hold it out as their residence, school bus comes to pick the child up from that residence. But what if they're in that situation because of the dire situation financially with respect to the parents? I understand that argument, Your Honor. I certainly believe that there can be circumstances where there are economic hardships that last. But in this case, again, looking at the facts, J.S. lost his job for a very short period of time and resumed employment. The family nevertheless decided to move into this home and they continue to remain there. There are many, many people in this world who live paycheck to paycheck. There's nothing in the McKinney-Vento Act that says you need to have so much in savings, you need to have your own place to live before you're not homeless, you need to have each person have their own bedroom. There's nothing in the Act that, in our opinion, is reading the Act way beyond what was ever intended by Congress. I think the intent of Congress is to address dire situations where a child is disrupted, their life is disrupted because of life circumstances and them having to move frequently and being disrupted in their education as a result. In the end, it sounds like, from what I'm reading the briefs and the argument today, that the sister is in the school district because there's not a real problem, but there were behavioral issues with regard to J.S. Correct. And the school district just doesn't, if it can legally do so, it doesn't want him there? Well, because of his behaviors, Your Honor. And they've gone through the process of, well, they were in the process, when the original incident occurred, they were in the process of determining the appropriate placement for J.S. And out of that conversation came the request by the appellees, by J.S. and E.S., that he be placed in private school. So based on that, in reliance on that promise, because, again, that request for private school came from the family, the school district agreed. So the school district, in essence, placed itself in a worse position by agreeing to settle a case, to gain some stability, to be able to have some assurance that this matter was going to be resolved. It was a very serious incident that very seriously disrupted school and caused a lot of fear among the community. Thank you.